

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GRAND VEHICLE WORKS HOLDINGS )
CORPORATION, )
)
Plaintiff, )
) No. 03 C 7948
v. )
)
THOMAS FREY and RICHARD FISH, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Grand Vehicle Works Holdings Corporation ("GVW") sued Defendants Thomas

Frey ("Frey") and Richard Fish ("Fish"), (collectively "Defendants"), for breach of contract,

tortious interference with a contractual relationship, breach of fiduciary duty, and unfair

competition. Defendants move for summary judgment on all counts. For the reasons discussed

below, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND

### I.      Parties And Relevant Non-Parties

GVW is a Delaware corporation with its principal place of business in Lake County,

Illinois. (R. 84-1; Pl.'s Resp. to Def.'s Stmt. Mat. Facts ("Def.'s SMF") ¶ 1.) Andrew Taitz is

the Chief Executive Officer of GVW. (*Id.*) Workhorse Custom Chassis, LLC ("Workhorse") is

a subsidiary of GVW. (*Id.* ¶ 2.) Workhorse manufactures "stripped chassis" for both Class A

motorhomes and for commercial step-vans. (*Id.*) Workhorse was formed in 1998 and maintains

production facilities in Union City, Indiana. (*Id.*) Workhorse only manufactures stripped

chassis and does not manufacture trailers. (*Id.* ¶3.) It is the only chassis manufacturer who only

manufactures stripped chassis. (*Id.*)

Frey resides in Centerville, Ohio. (*Id.* ¶ 5.) Workhorse employed Frey as its President from approximately June 1, 1999 to January 7, 2003. (*Id.*) In January 2003, Frey became and is currently the Chief Executive Officer of Universal Trailer Corporation ("Universal Trailer").

Fish also resides in Centerville, Ohio. (*Id.* ¶ 6.) Fish served as Workhorse's Vice President of Sales and Marketing from October 23, 2000 until August 1, 2003. (*Id.*) On August 1, 2003, Fish left Workhorse and went to work for Universal Trailer as its Vice President of Sales and Marketing. (*Id.*) Universal Trailer currently employs Fish in this same capacity. (*Id.*)

Tony Monda ("Monda") resides in Portage, Indiana. (*Id.* ¶ 7.) Workhorse employed Monda as its Director of Marketing from approximately May 1, 1999 to September 23, 2003. (*Id.*) On September 23, 2003, Monda left Workhorse and joined Universal Trailer's subsidiary, Haulmark Industries ("Haulmark"), as its Director of Marketing. (*Id.*) Monda currently serves Haulmark as its Director of Marketing. (*Id.*)

## II.     Motorhomes

The industry divides motorhomes into at least two classifications – "Class A" and "Class C" motorhomes. (*Id.* ¶¶ 13,14.) Class A motorhomes are bus-type motorhomes, such as those made by Winnebago, powered by either gas or diesel engines. (*Id.*) Gas-powered Class A motorhomes have their engines at the front of the vehicle between and under the driver's side and passenger side seats. (*Id.*) Gas-powered Class A motorhomes contain living quarters and typically range in size from 20 feet to 35 feet in length. (*Id.*) Diesel-powered Class A motorhomes have their engines in the rear of the vehicles, contain living quarters, and are between 30 feet and 42 feet in length.

Class C motorhomes (also referred to as a "mini-Class C") feature a box containing living quarters mounted behind a cab. (*Id.* ¶ 14.) A Class C motorhome is typically smaller in

length than Class A motorhomes, very maneuverable, and resemble an Econoline Van. (*Id.*) Within the Class C motorhome segment, is a subset of significantly different vehicles for heavy towing that meet specialty needs. (*Id.* ¶ 15.)

## III. Workhorse's Motorhomes

Workhorse is a manufacturer of "stripped chassis" for Class A motorhomes. (*Id.* ¶ 16.) A stripped chassis is the part of the Class A motorhome that includes the engine, transmission, axles, wheels, gas tank, exhaust system, and various other items. (*Id.*) Workhorse's stripped chassis does not have any seating, body, dashboard, headlights, taillights, or brake lights. (*Id.* ¶ 17.) An individual cannot lawfully drive a Workhorse stripped chassis on a public highway. (*Id.*) For Class A motorhomes, Workhorse manufactures both a gas-powered chassis ("P series" and "W series") and a "rear" diesel-powered chassis ("R series"), at least some of which are known in the trade as a "rear diesel pusher chassis." (*Id.* ¶ 18.) Workhorse's gas-powered stripped chassis has a towing capacity ranging between 3,500-5,000 pounds. (*Id.*) Workhorse's diesel-powered stripped chassis can tow approximately 11,000 pounds. (*Id.*)

Workhorse sells its stripped chassis to Class A motorhome manufacturers, including Fleetwood, Winnebago, National RV, Damon, Forest River, Four Winds, Monaco, Eldorado, Tiffin, Safari, Georgie Boy, Coachman, Holiday Rambler, and Airstream. (*Id.* ¶ 19.) These Class A motorhome manufacturers then build a Class A motorhome body on top of a Workhorse stripped chassis and sell the completed motorhomes to dealers. (*Id.*)

In 2003, Workhorse manufactured approximately 20,000 stripped chassis. (*Id.* ¶ 20.) Of the 20,000 stripped chassis manufactured and later sold to Class A motorhome manufacturers, only 52 chassis were rear diesel-powered chassis ("R series"). (*Id.*) According to Workhorse's Chief Financial Officer, Michael Dost, Workhorse's rear diesel-powered chassis sales to Class A

motorhome manufacturers were "de minimis." (*Id.*) On March 25, 2004, Workhorse reported that its first rear diesel-powered chassis had been sold at retail. (*Id.*)

Workhorse engages in pull-through marketing, whereby Workhorse markets its stripped chassis to Class A motorhome consumers. (*Id.* ¶ 21.) Pursuant to this strategy, Workhorse markets its stripped chassis so that an individual will opt to include a Workhorse chassis in their Class A motorhome. (*Id.*)

## IV. Haulmark's Motorcoaches

In an attempt to maintain its race trailer market share that Haulmark perceived it was losing to a company named Renegade, Haulmark contracted with a supplier for the building of a "Motorcoach" (known as a "conversion") under the Haulmark brand name and to sell those motorcoaches through its established trailer dealer channel. (*Id.* ¶ 28.) During this time period, a company named Showhauler had the responsibility for Haulmark's Motorcoach conversions. (*Id.* ¶ 29.) In 2000, Haulmark moved its motorcoach conversions in-house. (*Id.*)

Haulmark is a motorcoach "converter" – that is, Haulmark does not manufacture the chassis. (*Id.* ¶ 30.) Rather, Haulmark purchases a diesel "Class 8" semi-truck chassis (also known as a "cab chassis") from Freightliner Truck in a completed form. (*Id.*) Using a plasma cutter, Haulmark removes the rear of the semi-truck chassis' cab. (*Id.* ¶ 31.) Haulmark then converts the semi-truck chassis into a Class C motorcoach by building a box over the semi-truck chassis. (*Id.*) Haulmark designs its Motorcoaches to tow heavy loads and to have towing capacities ranging from 20,000 to 30,000 pounds. (*Id.* ¶ 32.) Haulmark sells its Motorcoach conversions to dealers. (*Id.* ¶ 33.) In 2003, Haulmark sold 27 motorcoaches at retail. (*Id.* ¶ 39.)

**V.     Defendants' Non-Competition Agreements**

In connection with a stock option grant, Workhorse presented Frey and Fish with identical Confidentiality and Non-compete Agreements containing a Delaware choice of law provision (collectively "Defendants' Agreements.") (*Id.* ¶ 42.) Section 2(a) of the Defendants' Agreements is entitled "Non-Competition" and provides:

> During the Term of Non-Competition, the Employee shall not engage in any Prohibited Competition, either directly or indirectly, without, in any instance, obtaining prior written consent of the Company, which consent may be granted or withheld by Company in its sole discretion.

(*Id.* ¶ 43.) The "Term of Non-Competition" (Section 1(d)) contained in Defendants' Agreements means the 12-month period following the Employee's termination of employment. (*Id.* ¶ 44.) Section 1(c) of Defendants' Agreements defines "Prohibited Competition" as:

> [e]ngaging in, rendering services to, assisting, participating in the affairs of, or otherwise being connected with, any person or enterprise (other than the Company), which is a Competing Business.

(*Id.* ¶ 45.) Section 1(b) of the Defendants' Agreements defines a "Competing Business" as:

> [A]ny person or enterprise engaged in, or planning to engage in any business that is in any respect competitive with the business of the Company, and such business requires the Employee to act in any capacity which, directly or indirectly involves the manufacture, design, assembly, servicing, integration, installation and/or sale, lease, resale or marketing of products anywhere in North America that are similar to products sold or marketed by the Company as of the date of the Employee's termination of employment with the Company or at any time during the twelve-months immediately preceding such date or utilizes the Employee's services in selling any other products to any person or entity to which the Company sold or actively attempted to sell such products within the twelve-month period immediately prior to the termination of the Employee's employment with the Company.

(*Id.* ¶ 46.)

Paragraph 3 of Defendants' Agreements contain a non-solicitation provision, which provides:

During the Term of Non-Competition, Employee will not, and will not permit any of his affiliates to, directly or indirectly, recruit or otherwise solicit or induce any employee, customer, subscriber or supplier of the Company to terminate its employment or arrangement with the Company, otherwise change its relationship with the Company or establish any relationship with the Employee or any of his affiliates for any business purpose deemed competitive with the business of the Company.

(*Id.* ¶ 48.)

## VI.    Fish's Share Purchase Agreement

In Spring 2002, Fish also signed a Confidentiality and Non-Compete Agreement ("Fish's Share Purchase Agreement") after purchasing $10,000 of GVW stock at $4.28 a share. (*Id.* ¶ 51.) The Fish Non-Compete contains language identical to the "non-competition" (and its defined terms) and the "non-solicitation" (and its defined terms) provisions in Defendants' Agreements. (*Id.*) Fish's Share Purchase Agreement, however, contains an Illinois choice of law provision.

## VII.   Defendants' Departure From Workhorse

### A.    Frey's Departure

In late, 2002, Frey met with Steven Price, who at that time was associated with Dubin Clark, an investment firm and general partner of the fund that acquired equity in Universal Trailer. (*Id.* ¶ 58.) Frey proceeded to interview with Universal Trailer. (*Id.* ¶ 59.) During that interview process, Frey also interviewed with Dubin Clark Partners, and Universal Trailer Board Members, Tom Caracciolo and William Dabney in Greenwich, Connecticut. (*Id.*) After interviewing with Mr. Caracciolo and Mr. Dabney, Universal Trailer offered Frey the position of Chief Executive Officer. (*Id.* ¶ 60.) Universal Trailer offered Frey a salary higher than his Workhorse salary. (*Id.*) Further, Frey understood that Universal Trailer was offering a superior opportunity for bonus, stock option achievement, and title, than what Frey had at Workhorse.

(*Id.*) In December 2002, Frey informed Mr. Taitz at Workhorse that he was going to leave

Workhorse unless Taitz resolved certain issues. (*Id.* ¶ 61.) Frey also sent documents to Taitz in

late December 2002 that mentioned Frey leaving Workhorse. (*Id.* ¶ 62.) On January 7, 2003, at

a meeting in Union City, Indiana, Frey informed Taitz that his resignation was final. (*Id.* ¶ 63.)

During this conversation, Frey told Taitz that he was going to work for a company in Cincinnati,

Ohio, that made trailers. (*Id.*) Frey left Workhorse that same day. (*Id.*) After Frey left

Workhorse, Taitz contacted Frey in February 2003 and asked him to return to Workhorse. (*Id.*)

### B.     Fish's Departure

When Frey left Workhorse in January 2003, Taitz and Fish discussed the vacancy in the

President position at Workhorse. (*Id.* ¶ 65.) Fish was interested in becoming president of

Workhorse and Taitz told him that he was a candidate. (*Id.*) Taitz explained that Workhorse

would interview both internal and external candidates for this position, and Taitz expressed his

hope that the company would fill the position by March 2003. (*Id.*) During late-February/early-

March 2003, Fish met with an executive consulting firm hired by Workhorse to assist the

company in its search for a president. (*Id.* ¶ 66.) At a company-sponsored event in April 2003,

however, Taitz advised Fish that Workhorse was going to hire an outside candidate. (*Id.*) Fish

responded that not receiving the promotion disappointed him. (*Id.*) Fish informed Taitz that he

intended to look at opportunities outside of the company if Workhorse did not give him certain

responsibilities. (*Id.*) Taitz responded by offering Fish increased responsibilities, additional

salary, and additional stock options. (*Id.*) In the late-February/early March 2003 timeframe,

while Workhorse was considering Fish for the president's position, Fish commenced looking for

recruiters to determine what was available in the job market. (*Id.* ¶ 66.) Fish contacted a

recruiter, Scott McGee, whom Fish had known since 1999. (*Id.*) Fish also contacted past

acquaintances – including Frey, in hope of obtaining the name of a recruiter. (*Id.*) In February/March 2003, when Fish contacted Frey, they also discussed opportunities for Fish at Universal Trailer. (*Id.* ¶ 68.) Frey responded that he did not have any open positions, but something might be available in the future. (*Id.*)

During the Memorial Day weekend, 2003, Fish and Frey ran in the Lou Cox Memorial race in Dayton, Ohio. (*Id.* ¶ 70.) Fish and Frey again discussed the possibility of Frey moving to Universal Trailer. (*Id.*)

In June 2003, Universal Trailer's Chairman, Steve Price, persuaded Frey to create a Corporate Vice President of Sales and Marketing position at the Universal Trailer level. (*Id.* ¶ 71.) During June 2003, Fish and Frey had another discussion regarding Universal Trailer. (*Id.* ¶ 72.) During their conversation, Frey indicated that Universal Trailer was creating a Vice President of Sales and Marketing position at the corporate level. (*Id.*) Fish expressed his interest in this position. (*Id.*) On June 22, 2003, Fish sent his resume to Mr. Carraciolo at Durbin & Clark as Frey suggested. (*Id.* ¶ 74.) On June 24, 2003, Fish interviewed with the three Dubin & Clark partners who served on Universal Trailer's Board – Mr. Caracciolo, Mr. Price, and Mr. Dabney. (*Id.*) These partners thought Fish would be a strong addition to the Universal Trailer team. (*Id.* ¶ 75.) Frey had reported his high regard for Fish's performance when they worked together at Workhorse. (*Id.* ¶ 75.) On June 30, 2003, Fish received an offer from Universal Trailer. (*Id.* ¶ 76.) The decision to hire Fish was a joint decision among Frey, Caracciolo, Dabney, and Price. (*Id.*) Prior to receiving the offer, Fish spoke with Frey on the telephone regarding the position at Universal Trailer. (*Id.* ¶ 77.) Fish resigned from Workhorse in a letter dated July 7, 2003, and accepted a position at Universal Trailer one day later. (*Id.* ¶ 78.)

## VIII. Tony Monda's Departure From Workhorse

After Fish left Workhorse, in August 2003, Fish and Monda had a conversation. Fish told Monda that a director of marketing position at Haulmark had become available because Haulmark had promoted to General Manager its Vice-President of Marketing. (*Id.* ¶ 84.) Later that month, Fish and Monda met at a restaurant where they discussed the open marketing position at Haulmark. (*Id.* ¶ 85.) Monda considered this meeting to be part of the interview process. (R. 86-1; Def.'s Resp. to Pl.'s Stmt. Add. Mat. Facts ("Pl.'s SAMF") at ¶ 33.) Haulmark formally interviewed two candidates, including Monda, for the marketing position. (Def.'s SMF ¶ 86.) After Monda's formal interview, Fish extended an offer to Monda over the phone. (Pl.'s SAMF ¶ 39.) Fish followed up this phone conversation with a written offer to Monda. (*Id.* ¶ 40.) Monda accepted the offer by signing the letter from Fish. (*Id.*) After accepting the position at Haulmark, Monda thanked Fish and Frey for including him as part of the Universal Trailer team. (*Id.* ¶ 41.)

## ANALYSIS

### I. Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265

(1986). The Court considers the evidentiary record in a light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

## II. Illinois Law Governs The Agreements

Defendants first argue that the Court should construe Defendants' Agreements according to Illinois law, and reject the Delaware choice of law provision in them.[1] GVW does not address this argument, and in fact tacitly concedes that Illinois law applies because it cites Illinois law in support of its assertion that Defendants breached the non-competition provisions in Defendants' Agreements. (R. 82-1; Pl.'s Resp. Br. at 7.) Therefore, the Court will apply Illinois law to Defendants' Agreements.

## III. Whether The Non-Competition Provisions Are Enforceable

### A. Illinois Law On Non-Compete Agreements

Illinois courts disfavor and closely scrutinize restrictive covenants because they are "repugnant to the public policy encouraging an open and competitive marketplace." *Roberge v. Qualiteck Int'l, Inc.*, No. 01-C-5509, 2002 WL 109360, at *4 (N.D. Ill. Jan. 28, 2002) (citing *Bishop v. Lakeland Animal Hosp.*, 268 Ill.App.3d 114, 644 N.E.2d 33, 36 (Ill.App.Ct. 1994)).

---

[1]Defendants rely on *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 948-49 (7th Cir. 1994), for the proposition that an Illinois court will not honor the parties' designation of Delaware law in a restrictive covenant when there is "insufficient connection between the contract and the State of Delaware." Illinois Courts generally give effect to contractual choice of law clauses. *See M. Block & Sons, Inc. v. International Bus. Machines Corp.*, No. 04-C-340, 2004 WL 1557631, at *3 (N.D.Ill. July 8, 2004). Here, however, as in *Suess*, the only connection between this case and Delaware is that GVW is incorporated there. On the other hand, GVW's "principal place of business is in Illinois" and "the agreements at issue were made in and substantially performed in Illinois." (Def.'s SMF ¶¶ 1, 12.) Further, as the Seventh Circuit recognized in *Suess*, Delaware law on restrictive covenants is contrary to Illinois public policy because Delaware courts enforce such contracts if they protect only a "legitimate economic interest," rather than requiring "a protectable interest." *Suess*, 24 F.3d at 944. As discussed in Section III.A. of this Analysis, Illinois public policy views as "repugnant" restrictive covenants that secure more than an employer's protectable interests.

Illinois law requires that in order to enforce a covenant not to compete, it must secure a

"protectable interest" of the employer. *Suess*, 24 F.3d at 944. Illinois courts recognize two

enforceable protectable interests:

> (1) where the customer relationships are near-permanent and but for the
> employee's association with the employer and employee would not have had
> contact with the customers; and (2) where the former employee acquired trade
> secrets or other confidential information through his employment and
> subsequently tried to use it for his own benefit.

*Outsource Int'l, Inc. v. Barton,* 192 F.3d 662, 666 (7th Cir. 1999). Restrictive covenants should

be narrowly tailored so as only to protect the protectable interest of the employer. *Id.* at 669;

*Lawrence and Allen, Inc. v. Cambridge Human Resource Group, Inc.,* 292 Ill.App.3d 131, 138,

685 N.E.2d 434, 441, 226 Ill.Dec. 331 (Ill.App.Ct. 1997). In particular, the time and geographic

limitations must be reasonably necessary to protect a legitimate business interest of the

employer. *Roberge,* 2002 WL 109360, at *4. A restrictive covenant that does not contain a

geographic limitation may still be enforceable if the covenant instead includes an "activity

restraint." *Id.* at *6. The most common type of activity restraint is a prohibition against

soliciting the former employer's customers. *Eichman v. Nat'l Hosp. and Health Care Servs.,*

*Inc.,* 308 Ill.App.3d 337, 719 N.E.2d 1141, 1147 (Ill.App.Ct. 1999).

### B. The Court Will Not Enforce The Non-Competition Provisions Merely Because They Include Language Stating That The Agreements Are Enforceable

GVW points to ¶ 5 of the Non-Competition Agreements, stating:

> The Employee acknowledges that the geographic boundaries, scope of prohibited
> activities, and time duration of this Agreement are reasonable in nature and no
> broader than are necessary to maintain the goodwill of the Company and its
> affiliates and confidentiality of their Confidentiality Information, and to protect
> the other legitimate business interests of the Company and its affiliates.

(R. 76-1; Def.'s Ex. 3 at ¶ 5.) GVW argues that because the parties agreed to such, the Agreements are necessary for the protection of GVW's legitimate business interests. As Defendants correctly set forth, however, the Seventh Circuit has held that "[i]t is improper under Illinois law to enforce a non-competition clause merely because the parties agreed to such an arrangement." *Advant Elecs., Inc. v. Buckman*, 112 F.3d 267, 274 (7th Cir. 1997). In *Advant Elecs.*, the agreement at issue included language similar to ¶ 5 of the Agreements here. Accordingly, the language of ¶ 5, by itself, is insufficient to render the Defendants' Agreements enforceable unless they otherwise satisfy the requirements of Illinois law.

## C. Whether The Non-Competition Provisions Secure A Protectable Interest Of GVW

In support of its argument that the non-competition provisions in ¶ 2 secure a protectable interest, GVW relies on the fact that Defendants admit that they had access to GVW's confidential and proprietary information. (Pl.'s SAMF ¶ 4.) This, however, only satisfies part of the test for whether a restrictive covenant secures a protectable interest of the employer under Illinois law. GVW must also show that Defendants tried to use GVW's confidential information for their own benefit. *Outsource Int'l*, 192 F.3d at 666. *See also Springfield Rare Coin Galleries, Inc.*, 250 Ill.App.3d 922, 931, 620 N.E.2d 479 (Ill.App.Ct. 1993) (affirming trial court decision that even if it did consider the information as confidential, the evidence did not establish that the defendant used this information to his benefit). GVW asserts that Defendants utilized GVW's marketing strategies and other knowledge gained at Workhorse relating to marketing of Class A motorhomes in order to better position Haulmark's product. GVW, however, fails to point to any evidence that its marketing strategies were confidential. In fact, GVW admits that "pull-through marketing" is a basic marketing strategy. (Def.'s SMF ¶ 21(d).) Further, Mr. Taitz, the Chairman and Chief Executive Officer of GVW, admitted at his

12

deposition that he does not believe that Frey or Fish stole Workhorse's competitive information and used it at their new employer. (Def.'s Ex. 7 at 78:18-21.) While Mr. Taitz further testified that he thought that "maybe" Defendants had adopted Workhorse's confidential strategies, when further questioned, Mr. Taitz could not identify any specific confidential strategies. (*Id.* at 79:1-5.)

GVW also points to evidence that Defendants engaged Workhorse's own marketing and advertising firms to assist them in their efforts. (Pl.'s SAMF ¶ 42.) But GVW does not argue, let alone point to any evidence, that the identity of the firms was confidential or that Defendants used GVW's confidential information while engaging them. Accordingly, GVW has failed to demonstrate any genuine dispute of a material fact that ¶ 2 in Defendants' Agreements does not secure a protectable interest of GVW.

## D.    Whether The Non-Competition Provisions Contain Reasonable Geographic Or Activity Restraints

Alternatively, even if the non-competition provisions in Defendants' Agreements did secure a protectable interest under Illinois law, those provisions are nonetheless unenforceable because they are not narrowly tailored to secure only that protectable interest. GVW first argues that its non-competition provisions contain a reasonable activity restraint because they restrain the use of its confidential information by competitors. The non-competition provisions in ¶ 2, however, do not on their face relate to GVW's confidential information, but instead relate to competition in general. Rather, ¶ 4 of Defendants' Agreements contains the provisions relating to confidential information. Therefore, GVW has not pointed to any reasonable activity restraint contained in the non-competition provisions of the Agreements.

GVW also argues that the non-competition provisions are reasonably restricted by geography. In particular, GVW argues that "the Agreements restrict Defendants from competing

13

with GVW by accepting employment with a 'Competing Business' within North America." (R. 82-1; GVW's Resp Br. at 9.) But GVW misstates the actual language of the Agreements. The Agreements define "Competing Business" in part as a business that "requires the Employee to act in any capacity which, directly or indirectly involves the manufacture, design, assembly, servicing, integration, installation and/or sale, lease, resale or marketing of products anywhere in North America that are similar to products sold or marketed by the Company []." (R. 76-1; Def.'s Ex. 3 at ¶ 1.) Accordingly, the non-competition provision prevents Defendants from working anywhere in the world, not just North America, assuming the job satisfies the other criteria of the definition of "Competing Business." Further, while GVW argues that North America is "clearly the company's territory of business," (R. 82-1; GVW's Resp. Br. at 9), GVW's argument misses the point. As courts in this district have noted, the "inquiry concerns not where [the employer] does business but, rather, where [the individual's] employment might risk [the employer's] legitimate business." *Telxon Corp. v. Hoffman,* 720 F.Supp. 657, 664 (N.D.Ill. 1989). GVW has failed to point to any evidence demonstrating that Defendants' employment in any particular geographic area might risk GVW's or Workhorse's legitimate business.[2] Therefore, the non-competition provisions of Defendants' Agreements are not narrowly tailored to reasonably secure any protectable interest of GVW and are unenforceable under Illinois law.[3]

---

[2]GVW also fails to point to any evidence showing that its business extends throughout North America.

[3]The Court does not reach the issue of whether Universal Trailer or Haulmark constitute Competing Businesses under the terms of Defendants' Agreements.

14

## IV. Whether Defendants Violated Their Non-Solicitation Obligations

Defendants argue that there is no evidence that they "solicited" a GVW employee in violation of the non-solicitation provisions in Defendants' Agreements.[4] GVW points to evidence creating a genuine issue of fact whether each Defendant did themselves, or permit their affiliates to, "directly or indirectly, recruit or otherwise solicit or induce any employee [] of the Company to terminate its employment with the Company." (R. 76-1; Def.'s Ex. 3 at ¶ 3.) The Court addresses in turn the involvement of Frey in the hiring of Fish and the involvement of Fish in the hiring of Monda.

### A. Frey's Involvement In Universal Trailer Hiring Fish

GVW points to evidence creating a genuine issue of fact whether Frey recruited Fish in violation the non-solicitation provisions of Defendants' Agreement. Taken in the light most favorable to GVW, the evidence shows that Frey was primarily responsible for hiring a Vice President of Sales and Marketing, the position ultimately filled by Fish. (Pl.'s SAMF ¶ 17.) Prior to Fish joining Universal Trailer, Frey told Fish that a position was available. (*Id.* at ¶ 18.) Frey provided Fish with contact information for other Universal Trailer employees involved in hiring decisions and Frey arranged Fish's interviews. (*Id.* at ¶ 19.) Fish listed Frey as the "referral name" on his job application to Universal Trailer because he learned of Universal Trailer from Frey. (*Id.* at ¶ 26.) After Fish's interviews with Universal Trailer, Frey had several telephone conversations with Fish exploring Fish's possible employment with Universal Trailer. (*Id.* at ¶ 20.) Frey conveyed his support for the hiring of Fish to the members of Universal

---

[4]Defendants argue for the first time in their Reply Brief that the non-solicitation provisions in Defendants' Agreements are unenforceable. Because Defendants did not raise this argument in their Opening Brief, the Court does not address the enforceability of the non-solicitation provisions. *See Hrobowski v. Worthington Steel Co.,* 358 F.3d 473, 480 n.1 (7th Cir. 2004) (noting that courts will not consider arguments not properly raised until the reply brief).

Trailer's Board of Directors and was part of the group that decided to hire Fish. (*Id.* at ¶ 21.)
Additionally, Frey, along with other Universal Trailer employees, sent the offer letter to Fish.
(*Id.* at ¶ 22.) Frey also discussed with Fish various modifications to the terms of his offer. (*Id.*
at ¶ 24.) When Fish accepted his offer, he sent his acceptance letter to Frey. (*Id.* at ¶ 24.) These
facts create a genuine issue of fact whether Frey recruited Fish in violation of the non-
solicitation provision of Defendants' Agreement. *See YCA, LLC v. Berry,* No. 03 C 3116, 2004
WL 1093385, at *10 (N.D.Ill. May 7, 2004) (interpreting "solicitation" broadly in denying
summary judgment).

**B.      Fish's Involvement In Universal Trailer Hiring Monda**

GVW also points to evidence creating a triable issue of fact whether Fish's involvement
in the hiring of Monda violated the terms of Fish's non-solicitation provision. Monda learned of
the open Director of Marketing position at Haulmark from Fish. (Pl.'s SAMF at ¶ 31.) In late
August 2003, Fish and Monda met at a restaurant where they discussed the position. (*Id.* at ¶
32.) Fish indicated that he wanted Monda to interview for the position. (*Id.*) In fact, the
meeting between Monda and Fish was such that Monda believed the meeting itself was an
interview. (*Id.* at ¶ 33.) Fish reviewed, and gave Monda direction regarding, his resume. (*Id.* at
¶ 34.) Fish was involved in Universal Trailer's decision to hire Monda. (*Id.* at ¶ 38.) Fish was
the person that officially extended the offer to Monda. (*Id* at ¶ 39.) These facts demonstrate a
genuine issue of material fact whether Fish's involvement in hiring Monda violated the non-
solicitation provision of Defendants' Agreement. *See YCA,* No. 03 C 3116, 2004 WL 1093385,
at *10.

## V.  GVW's Tortious Interference, Breach Of Fiduciary Duty, And Unfair Competition Claims

Defendants argue that without a valid breach of contract claim, there is no basis for Plaintiff's tortious interference, breach of fiduciary duty, or unfair competition claims. Because genuine questions of fact exist regarding whether Defendants breached the non-solicitation provision of their Agreements, the Court cannot grant summary judgment on these other claims.

## CONCLUSION

The Court grants Defendants motion in part. The non-competition provisions in ¶ 2 of Defendants' Agreements are unenforceable because they are not narrowly tailored to secure a protectable interest under Illinois law. The Court also denies Defendnats motion in part because genuine issues of material fact exist whether Defendants breached the non-solicitation provisions of their Agreements.

Dated: May 11, 2005                    ENTERED:

AMY J. ST EVE
United States District Court Judge